IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DISTRICT OF COLUMBIA WATER    *
AND SEWER AUTHORITY,
                                                 *
    Plaintiff,
                                                 *
v.
                                                 *     Civil No. 23-01328-BAH
SAMAHA ASSOCIATES, PC, et al.,
                                                 *
    Defendants.
                                                 *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

District of Columbia Water and Sewer Authority ("DC Water") brought suit against Samaha Associates, PC ("Samaha"), Adtek Engineers, Inc., and ECS Mid-Atlantic, LLC, seeking compensatory damages related to the Defendants' assessment of environmental conditions on a property DC Water acquired. ECF 30 (First Amended Complaint) ¶ 1. Subsequently, Cross-Plaintiff, Adtek Engineers, Inc. ("Adtek"), sued Cross-Defendant ECS Mid-Atlantic, LLC ("ECS"). ECF 44. Pending before the Court is ECS's motion to dismiss Adtek's crossclaim. ECF 50. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings including Adtek's opposition, ECF 55, and ECS's reply, ECF 56. The Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons stated below, ECS's motion to dismiss at ECF 50, is **DENIED**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

I. BACKGROUND

This action arose because DC Water sought to construct a Fleet Maintenance Facility (the "Project") and hired Samaha to conduct architectural and engineering related services on the Project (the "DC Water/Samaha Contract"). ECF 44 ¶ 2.

A. The Phase I ESA

One of Samaha's alleged responsibilities pursuant to the DC Water/Samaha Contract was to conduct a Phase I Environmental Assessment ("Phase I ESA") of property DC Water intended to purchase for the Project. *Id.* ¶ 3 (citing ECF 30 ¶ 14). Thereafter, Samaha contracted the Phase I ESA duty, among other duties, out to Adtek (the "Samaha/Adtek Subcontract") and Adtek contracted the Phase I ESA duty out to ECS (the "Adtek/ECS Subcontract"). *Id.* ¶ 4 (citing ECF 30 ¶ 15).

ECS performed the Phase I ESA in 2014 and compiled its findings into a Phase I ESA report (the "Report") on November 13, 2014. ECF 30 (DC Water's Amended Complaint) ¶ 16; *see* ECF 44 ¶ 11 (adopting and incorporating the factual allegations of DC Water's Complaint). ECS stated that its Phase I ESA "me[t] the requirements of ASTM E 1527-13, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment." ECF 30 ¶ 17. The Report indicated that, in ECS's professional opinion, there was "no evidence of recognized environmental conditions in connection with the property." *Id.* ¶ 20.

On May 27, 2015, DC Water, in reliance on the professional opinions of ECS outlined in the Report, purchased a property from Broad Creek Conservancy, Inc. for $699,000. *Id.* ¶ 21. On June 20, 2020, DC Water's general contractor began performing construction and site work. *Id.* ¶ 23. The general contractor encountered "environmental conditions that disrupted the work and required remediation." *Id.* ¶ 24. "These adverse environmental conditions included, among other conditions, buried debris and waste." *Id.* As a result of the environmental conditions, DC Water

2

alleges it incurred significant Project-related damages. *Id.* ¶ 25. DC Water alleges that had ECS performed the Phase I ESA "in accordance with the applicable standard of care, it would have discovered numerous adverse environmental conditions." *Id.* ¶ 27. DC Water alleges that had it known of the adverse environmental conditions, that knowledge would have been incorporated into "its decision to purchase the Property and in its planning, design, and budgeting for the Project." *Id.* 28. DC Water attached and incorporated a Certificate of Qualified Expert, executed by Christina Lewis, PG, *id.* ¶ 30, who opined that ECS's Phase I ESA "failed to meet the applicable standard of care." ECF 1-2, at 2.

### B. The Relevant Contracts

Adtek incorporates the Adtek/ECS Subcontract that was attached to Samaha's crossclaim against Adtek and ECS into its crossclaim. ECF 44 ¶ 12 ("incorporate[ing] herein by reference" the Adtek/ECS Subcontract); *see also* ECF 19-3 (Adtek/ECS Subcontract). The Adtek/ECS Subcontract describes the Project and the scope of ECS's services. *See generally* ECF 19-3. The services included subsurface exploration services (*i.e.*, drilling and sampling), laboratory testing, and analysis by an ECS Geotechnical Engineer. *Id.* at 6–8. Adtek accepted ECS's proposed price of $7,085.50 for the services. *Id.* at 8.

The Adtek/ECS Subcontract included three pages of ECS's proposed terms and conditions. *Id.* at 10–13. ECS's proposal stated these "Terms and Conditions of Service" were "an integral part of [ECS's] proposal." *Id.* at 9. The President of Adtek signed the document but made certain revisions, including crossing out the three pages of "Terms and Conditions," *see id.* at 11–13, and inserting instead: "The Terms and Conditions with ADTEK's client shall apply to this agreement. ADTEK will forward the Terms and Conditions after we receive them for your review and acceptance." *Id.* at 11.

Among the crossed-out terms was an indemnification clause that read, in part:

3

> 19.1 ECS agrees to hold harmless and indemnify CLIENT from and against damages arising from ECS' negligent performance of its Services, but only to the extent that such damages are found to be caused by ECS' negligent acts, errors, or omissions, (specifically excluding any damages caused by any third party or by the CLIENT).
> 19.2 To the fullest extent permitted by Law, CLIENT agrees to indemnify, and hold ECS harmless from and against any and all liability, claims, damages, demands, fines, penalties, costs and expenditures . . . caused in whole or in part by the negligent acts, errors, or omissions of the CLIENT . . . .
> 19.3 It is specifically understood and agreed that in no case shall ECS be required to pay an amount of Damages disproportional to ECS' culpability. . . .

*Id.* at 13.

Nevertheless, Adtek alleges that by stating the Terms and Conditions of Adtek's Client applies, the Adtek/ECS Subcontract was incorporating and adopting the Terms and Conditions from the Samaha/Adtek Subcontract. *See id.* ¶ 12. The Samaha/Adtek Subcontract included the same language, indicating that the "Terms and Conditions" of the Client's Contract would apply, in reference to the DC Water/Samaha Contract. *Id.* ¶¶ 12–13. In other words, Adtek asserts the incorporation of the prior contracts' terms indicated they would apply to each downstream contractual relationship. *Id.*

The DC Water/Samaha Contract originally identified two parties: the "Authority" and the "Consultant." *See* ECF 37 (Samaha's First Amended Crossclaim) ¶ 16. In that Contract, the "Authority" was DC Water and the "Consultant" was Samaha. *Id.*

Thus, Adtek alleges the contract "provides that ECS, as the applicable 'Consultant'":

[S]hall indemnify and save harmless [ADTEK] and all of its officers, directors, agents, servants and employees against any and all claims or liability arising from or based on, or as a consequence or result of, any negligent act, error, omission or fault of the Consultant, its employees, or its subcontractors in the performance of, or connection with any services required, contemplated, or performed under this Agreement; and the Consultant shall indemnify and save harmless [ADTEK] and all of its officers, directors, agents, servants and employees, against any and all claims or liability arising from or based on, or as a consequence or result of, any act of approval, inspection, supervision, or acceptance, or any failure to approve, inspect, supervise or accept, by [ADTEK] and any of its officers, directors, agents,

4

> servants or employees, where the act of approval, inspection, supervision, or acceptance, or failure to approve, inspect, supervise or accept, causes or contributes to any negligent act, error, omission, or fault of the Consultant, its employees, or its subcontractors in the performance of, or in connection with any services required, contemplated or performed under the Agreement; further the Consultant shall indemnify and save harmless [ADTEK] and all of its officers, directors, agents, servants and employees against any and all claims or liability a rising from or based on, or as a consequence or result of, the breach of any material provision of this Agreement. Monies due or to become due to the Consultant under the agreement may be retained by [ADTEK] as necessary to satisfy any outstanding claim which [ADTEK] may have against the Consultant regardless of whether or not any damage resulting from the Consultant, its employees, or its subconsultants acts, omissions or default is caused in part by [ADTEK].

*Id.* ¶ 14 (alteration in original) (emphasis omitted). Adtek alleges that "if the Phase I ESA is adjudged to have breached the standard of care," then ECS is obligated "to indemnify and save harmless ADTEK against any liability arising from ECS's negligent performance of services." *Id.* ¶ 15.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.,* 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Twombly,* 550 U.S. at 555). At the same time, a "complaint will not be

dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

In this case, the Court considers the Adtek/ECS Subcontract as it was expressly incorporated in Adtek's complaint, and it is integral to consider the disputed contract in a breach of contract dispute. *See, e.g.*, *Thaler v. Donald J. Trump for President, Inc.*, 304 F. Supp. 3d 473, 477 n.5 (D. Md. 2018) ("A contract is integral to a breach of contract claim[] . . . ."), *aff'd*, 730 F. App'x 177 (4th Cir. 2018); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) ("[I]f a breach-of-contract plaintiff alleges a failure to perform an act required by the contract, the contract's description of the defendant's duties will prevail over the plaintiff's contrary characterization."). The DC Water/Samaha Contract and the Samaha/Adtek Subcontract are not integral, however, because Adtek has not incorporated those documents in its Complaint. *See* ECS 44. Those contracts—while relevant—are not integral to resolving the dispute between Adtek and ECS, and it is unnecessary to look outside the pleadings to those documents when Adtek has incorporated sufficient factual allegations from DC Water's and Samaha's Complaints for the Court to adjudicate this Motion. *See* ECF 44 ¶ 11.

6

## III. DISCUSSION

Adtek's suit against ECS involves two claims: contractual indemnity (Count I) and breach of contract (Count II). The Court applies Maryland substantive law to resolve this dispute.[2] ECF 44, at 3–6. ECS's arguments as to the two Counts largely overlap and rest on the argument that the "Terms and Conditions" of the upstream contracts were not incorporated into ECS's contract with Adtek. ECF 51, at 1–9. The Court determines Adtek has sufficiently alleged plausible claims for both Counts and ECS's motion to dismiss will be DENIED.

### A. Adtek has sufficiently pleaded that the DC Water/Adtek Terms and Conditions were part of the basis of its bargain with ECS.

ECS argues that Adtek fails to state a claim for contractual indemnity[3] because the plain terms of the Adtek/ECS Subcontract do not include "any valid or enforceable indemnity obligation." ECF 51 (ECS's Memorandum in Support of its Motion to Dismiss Adtek's Crossclaim), at 4 (incorporating its arguments from ECS's motion to dismiss Samaha's Crossclaim at ECF 46). Specifically, ECS argues the Adtek/ECS Subcontract fails to reference "incorporation." *See id.* at 5. Further, ECS argues that the statement that the "The Terms and

---

[2] A federal court sitting in diversity applies the substantive law of the state in which it sits. *Megaro v. McCullum*, 66 F.4th 151, 159 n.4 (4th Cir. 2023) (citing *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004)). Accordingly, the Court applies Maryland's substantive law in considering the present motions.

[3] Contractual indemnity is available where "an indemnitor, by express contract, agrees to reimburse the indemnitee for a liability, loss, or damage that the indemnitee may incur that is within the scope of the indemnity." *Pulte Home Corp. v. Parex, Inc.*, 942 A.2d 722, 730 (Md. 2008); *Carroll Co. v. Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 565 (D. Md. 2012) (citing *Strong v. Prince George's Cnty.*, 549 A.2d 1142, 1144 (Md. App. 1988) for the proposition that "[i]ndemnification is an agreement to reimburse one who has been held liable for the amount of his loss"); *see also* 12 M.L.E. Indemnity § 4 ("Where the indemnity is pursuant to an express contract, the contract will determine whether the indemnification covers only the amounts paid by the indemnitee to a third party, plus the associated expenses, or includes unpaid parts of judgments as well, that is, whether the indemnity is against loss or damage only, or is against liability.").

7

Conditions with ADTEK's client shall apply to this agreement" is too vague and speculative to form an enforceable obligation. *Id.* at 5.

Adtek counters that the factual allegations in its crossclaim against ECS must be accepted as true. *See* ECF 55, at 1 (citing *Iqbal*, 556 U.S. at 678). Adtek argues the lack of the word "incorporation" does not defeat its claim because it states the Terms and Conditions "shall apply," *id.* at 2, and the word "apply" means "to put into operation or effect" and evinces the same intent. *Id.* (quoting *Merriam-Webster On-Line Dictionary*, https://www.merriam-webster.com/dictionary/apply (last visited Mar. 28, 2024)). Additionally, Adtek argues that other terms in the contract evince an intent for the indemnity relationship of other contracts to apply to Adtek and ECS. *Id.* Adtek notes that the contract indicates the Terms and Conditions will be sent to ECS for acceptance, indicating that ECS understood that the referenced Terms and Conditions would bind them upon acceptance. *Id.*

Below the Court discusses ECS's three primary arguments: (1) that the "Terms and Conditions" provision does not indicate that ECS agreed to indemnify Adtek; (2) that the provision is unenforceable for vagueness; and (3) that Adtek has failed to allege ECS ever actually accepted the proposed Terms and Conditions that Adtek forwarded to it.

        1. <u>Documents that are Incorporated Can Become Part of the Basis of the Bargain.</u>

In Maryland, "[w]hen an earlier document is 'incorporated by reference' into a subsequent contract, it simply means that the earlier document is made a part of the second document, as if the earlier document were fully set forth therein." *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 674 A.2d 106, 142–43 (Md. App. 1996) (citations omitted), *aff'd*, 695 A.2d 153 (Md. 1997). "Absent an indication of a contrary intention, the incorporation of one contract

8

into another contract involving different parties does not automatically transform the incorporated document into an agreement between the parties to the second contract." *Id.*

For instance, in *Hartford*, the Maryland Supreme Court rejected the same type of argument Adtek brings, albeit in relation to an arbitration clause. *Id.* There, the plaintiff (Hartford) argued that a bond which incorporated by reference a contract between two parties, Kraus and SHALP and included an arbitration provision, supported that the parties intended disputes regarding the bond to be resolved via arbitration. *Id.* The Court rejected this, noting that "even if that arbitration clause were incorporated into its bond, it only requires arbitration of disputes between Kraus and SHALP, not Harford and SHALP." *Id.* (emphasis in original).

The same logic could apply here, as even if the indemnification clause were incorporated into ECS's contract, it could be understood to only require indemnification between Samaha and Adtek, not ECS and Adtek. However, Adtek has offered more evidence of the parties' affirmative intent to be bound by the prior contracts. *See* ECF 19-3; ECF 55, at 2. Adtek notes the Adtek/ECS Subcontract states the Terms and Conditions of Adtek's Client (*i.e.*, Samaha) "shall apply," which suggests the terms were meant to be "be put into operation or effect" in the Contract with ECS. ECF 55, at 2 (quoting *Merriam-Webster On-Line Dictionary*, www.merriam-webster.com/dictionary/apply (last visited Mar. 28, 2024)). Additionally, Adtek argues that the provision indicating that Adtek would forward the Terms and Conditions of the prior Contract to ECS for acceptance further indicates ECS understood it was to be bound by the terms. ECF 55, at 2. The Court finds Adtek's arguments on this point persuasive.[4] Particularly in the context of a

---

[4] The meaning of the "Terms and Conditions" clause may be ambiguous. A contract is ambiguous when its terms are "uncertain or capable of being understood as having more than one meaning." *Lab. Ready, Inc. v. Abis*, 767 A.2d 936, 944 (Md. App. 2001) (citation omitted). Whether a contract is ambiguous is a question of law. *State Highway v. Bramble*, 717 A.2d 943, 949 (Md. 1998). "The determination of whether language is susceptible of more than one meaning includes

highly complex string of contractors and subcontractors, it is at least facially reasonable that such parties may wish to incorporate upstream risks and liabilities down the chain of subcontractor relationships. *See Iqbal*, 556 U.S. at 663–64 (noting whether a complaint states a plausible claim is "context specific" and requires "the reviewing court to draw on its experience and common sense"); *see, e.g., Wal-Mart Stores, Inc. v. J.A. Fielden Co.*, 440 F. Supp. 2d 523, 527–28 (W.D. Va. 2006) (featuring plaintiff that claimed it required all downstream contracts to include a provision granting plaintiff either contractual privity or third-party beneficiary status with all downstream subcontractors).

The Court finds Adtek has sufficiently pleaded that the incorporated documents became part of the basis of its bargain with ECS, because the Court construes Adtek's factual allegations on this point as true. *Iqbal*, 556 U.S. at 678; *Nemet Chevrolet, Ltd.*, 591 F.3d at 253.

### 2. The Terms were vague as to who would indemnify whom; however, the Terms are not unenforceable as a matter of law.

Under Maryland law, it is "well established that an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations." *Cnty. Comm'rs for*

---

a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Calomiris*, 727 A3d at 363 (quoting *Pacific Indem. v. Interstate Fire & Cas.*, 488 A.2d 486, 488 (Md. 1985)); *cf. Glagola v. Transwestern Dev. Co.*, No. 22-1890, 2023 WL 4759125 (4th Cir. July 26, 2023) ("A contract is not ambiguous merely because the parties do not agree as to its meaning." (quoting *Phx. Servs. Ltd. P'ship v. Johns Hopkins Hosp.*, 892 A.2d 1185, 1223 (Md. App. 2006))).

If the Adtek/ECS "Terms and Conditions" clause is ambiguous, then the ambiguity surrounding the incorporation of the indemnity clause generates a factual dispute about Adtek's and ECS's intentions when forming the contract. *See City of Bowie v. Mie Properties, Inc.*, 922 A.2d 509, 525 n.16 (Md. 2007) ("When ambiguity is found in a contract, it becomes a question of fact to decipher the intent of the parties in forming the instrument."); *see also Cram v. Sun Ins. Off., Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967) ("[T]he intent of the parties to an ambiguous contract is a question of fact which cannot properly be resolved on motions for summary judgment."). Under that circumstance, the Court would still be bound to resolve that dispute in favor of Adtek as the non-moving party on a motion to dismiss. *See Nemet Chevrolet, Ltd.*, 591 F.3d at 253.

10

*Carroll Cnty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. App. 2008). "If the contract omits an important term or is too vague with respect to essential terms, the contract may be invalid." *Id.* at 1210 (citation omitted); *Schloss v. Davis*, 131 A.2d 287, 290 (Md. 1957) ("[A] contract may be so vague and uncertain as to price or amount as to be unenforceable.").

However, "courts are reluctant to reject an agreement, regularly and fairly made, as unintelligible or insensible." *Id.* (alteration omitted) (quoting *Quillen v. Kelley*, 140 A.2d 517, 523 (Md. 1958)). Because the "law does not favor, but leans against the destruction of contracts because of uncertainty[,] . . . courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained" either from express terms or by fair implication. *Id.* (quoting *Quillen*, 140 A.2d at 523).

Given the early stage of this proceeding, the Court declines ECS's invitation to consider the indemnity provision to be unenforceable for vagueness. This decision is informed by the fact that ECS's own proposed terms and conditions included that ECS would indemnify Adtek for ECS's negligence where ECS's negligence caused the damages. *See* ECF 19-3, at 13. It would essentially grant ECS a windfall to rule on a motion to dismiss that the indemnity clause is unenforceable when ECS had originally anticipated some indemnity responsibilities, when the agreement was "regularly and fairly made," *Quillen*, 140 A.2d at 523, and if upon a finding of ambiguity, all parties could submit parol evidence that may inform the parties' intentions. *See Calomiris v. Woods*, 727 A.2d 358, 369 (Md. 1999) ("[T]he parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity.").

11

### 3. Adtek has sufficiently pleaded that the Terms and Conditions incorporated the upstream indemnity clause.

ECS argues that Adtek has failed to effectively plead the Terms and Conditions were incorporated because Adtek failed to allege that ECS actually accepted the Terms that were sent to it. ECF 51, at 9. Adtek argues that under the legal standard applied at the motion to dismiss stage, Adtek has alleged sufficient facts that, when construed in Adtek's favor along with all reasonable inferences, plausibly allege a claim of contractual indemnity. ECF 55, at 3. The Court agrees. Even without Adtek's express allegation of ECS's acceptance, the Court finds it is reasonably inferable that ECS accepted.

To begin, Adtek's substantial revisions to ECS's proposal, including crossing out all ECS's terms and conditions that ECS had identified as integral, turned Adtek's acceptance of ECS's proposal into a counteroffer, or more specifically, a qualified acceptance. *Letke v. Wells Fargo Home Mortg., Inc.*, Civ. No. RDB-12-3799, 2015 WL 6163517, at *4 (D. Md. Oct. 19, 2015) ("Indeed, an acceptance that modifies or alters the terms of performance is a counteroffer, and not unqualified acceptance." (citing *Ebline v. Campbell*, 121 A.2d 828 (1956))), *aff'd*, 639 F. App'x 955 (4th Cir. 2016); Restatement (Second) of Contracts § 39(1) (1981) ("A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer."); *see also* Restatement (Second) of Contracts § 39 cmt. b. (1981) ("A common type of counter-offer is the qualified or conditional acceptance, which purports to accept the original offer but makes acceptance expressly conditional on assent to additional or different terms.").

Acceptance may be reasonably inferred given that ECS began and completed its performance of the contractual obligations. *See* ECF 30 ¶¶ 18–20 (indicating DC Water received a completed Report with a Phase I ESA for the Project); Restatement (Second) of Contracts § 50(1)

12

(1981) ("Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a performance which operates as a return promise."). An "[a]ccceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Restatement (Second) of Contracts § 50 (1981); *see, e.g., Cheston L. Eshelman Co. v. Friedberg*, 133 A.2d 68, 73 (Md. 1957) (noting that a party to a contract who changed the manner of acceptance had, in fact, made a counter-offer, and noting that if the original offeree had accepted the counter-offer by performance, he would have created a contract).

When no manner of performance is specified, any reasonable manifestation of assent can constitute acceptance. *Cf. Baltimore Cnty. v. Archway Motors, Inc.*, 370 A.2d 113, 116 (Md. App. 1977) ("[W]hen a method of performance necessary to constitute acceptance of an offer has been prescribed, performance in some other manner does not constitute acceptance."); *see, e.g., Letke*, 2015 WL 6163517, at *4 (finding there was no acceptance when a counteroffer required the offeree to return certain documents to accept the offer, and the offeree did not do so). Unlike the contract in *Letke*, which specifically indicated a manner of acceptance of returning certain documents, the Adtek/ECS Contract does not state a specific manner of acceptance. ECF 19-3, at 11 (stating only that the Terms and Conditions will be forwarded "for [ECS's] review and acceptance"). Thus, there is nothing in the terms of the contract that would prevent this Court from construing ECS's performance of the Phase I duty to be an acceptance.

In this case it is uncontested that ECS performed its contractual obligation to conduct a Phase I ESA and that it compiled a Report since DC Water received ECS's Report and ECS's Report makes up the basis of this suit. *See* ECF 30 ¶¶ 18–20. As noted above, an acceptance can be effectuated via performance. *See e.g., Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1166

13

(6th Cir. 1972) (describing the common law conception that "terms of [a] counter-offer [are] said to have been accepted by the original offeror when he proceed[s] to perform under the contract without objecting to the counter-offer."); *see also DeGroft v. Lancaster Silo Co.*, 527 A.2d 1316, 1321 (Md. App. 1987) (discussing application of the common law to service contracts because "[t]he UCC does not apply to service contracts. . . ."). A reasonably prudent person may have construed the performance under the modified contract to constitute an acceptance to Adtek's modified Terms and Conditions. *See Cochran v. Norkunas*, 919 A.2d 700, 710 (Md. 2007) ("Under the objective theory of contracts, we look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement."). Therefore, the Court finds Adtek has alleged sufficient facts that if true plausibly allege a claim of contractual indemnity.

The Court notes that ECS's original Terms and Conditions, which were "integral" to ECS's proposal, ECF 19-3, at 9, largely overlap with the proposed indemnification clause Adtek alleges applies. *Compare* ECF 19-3, at 13 (indicating "Consultant shall indemnify and save harmless [ADTEK] . . . against any and all claims or liability arising from or based on, or as a consequence or result of, any negligent act, error, omission or fault of the Consultant"), *with* ECF 37 at ¶ 15 (stating "ECS agrees to hold harmless and indemnify CLIENT from and against damages arising from ECS' negligent performance of its Services, but only to the extent that such damages are found to be caused by ECS' negligent acts, errors, or omissions"). This common intent on the indemnity responsibilities of ECS to indemnify Adtek for ECS's negligence that causes damages demonstrates a meeting of the minds, sufficient to plausibly allege acceptance and incorporation. Therefore, ECS's motion to dismiss Count I is **DENIED** without prejudice.

**B.     Breach of Contract**

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Jay Dee/Mole Joint Venture v. Mayor & City Council of Balt.*, 725 F. Supp. 2d 513, 523 (D. Md. 2010) (quoting *Taylor v. NationsBank N.A.*, 776 A.2d 645, 651 (Md. 2001)). ECS's arguments on this Count are sparse. ECS incorporated its arguments raised in its motion to dismiss DC Water's Complaint, ECF 39-1, and arguments it raised in its motion to dismiss Samaha's crossclaim, ECF 46-1.

In ECS's motion to dismiss DC Water's complaint, it alleged that DC Water had failed to demonstrate ECS's actions proximately caused any damages. ECF 39-1, at 16. Applying that argument here, the Court construes ECS's argument to be that Adtek has insufficiently alleged proximate causation. ECF 51, at 9–10 (incorporating ECS's prior arguments).

In order for breach of contract damages to be recoverable, the damages "must be 'caused by the breach' of contract." *Simard v. Burson*, 14 A.3d 6, 16 (Md. App. 2011) (quoting Restatement (Second) of Contracts § 347(b) (1981)), *aff'd*, 35 A.3d 1154 (Md. 2012). "In other words, the losses claimed by the non-breaching party must have actually resulted from the breach." *Simard*, 14 A.3d at 17 (internal quotation omitted). ECS argued by prior motion that DC Water's complaint "wholly fails to allege that ECS's actions caused its damages or actually produced an injury." ECF 39-1, at 17 (internal citation and quotation marks omitted). As Adtek incorporated DC Water's factual allegations, the Court first reviews factual allegations DC Water pleaded supporting causation.

DC Water alleged:

- the purpose of the Phase I ESA was to help DC Water determine whether the Property was suitable for its intended purpose, namely to be the site of the planned Fleet Maintenance Facility, ECF 30, at ¶ 4;

15

- DC Water agreed to purchase the Property for $699,000.00 based on the professional opinions of ECS outlined in its Phase I ESA Report, *id.* at ¶ 21;
- "[k]nowledge of the adverse environmental conditions [overlooked by ECS] would have allowed DC Water to incorporate those [conditions] into its decision to purchase the Property and in its planning, design, and budgeting for the Project," *id.* at ¶ 28;
- DC Water might not have purchased the Property had it known of the adverse environmental conditions, *id.* at ¶ 29;
- the purpose of the Phase I ESA was not only to help DC Water decide whether to purchase the Property in the first instance, but also to help it decide how much to pay for it, *id.* at ¶ 35.

While ECS blames the environmental conditions of the Property as the "cause" of DC Water's damages, ECF 39-1, at 17, ECS acknowledges that DC Water's complaint would state a plausible claim if it alleged "that DC Water would not have purchased the Property, or that DC Water paid too much for the Property, or would have picked a different site for the Facility, or some other definite course that would have occurred but for ECS's 2014 Phase 1 ESA." ECF 39-1, at 18. This is precisely what DC Water did allege, albeit in less precise terms. When construing all factual allegations from DC Water that were incorporated by Adtek in Adtek's favor, it is reasonable to infer that had DC Water known of the environment condition of the Property, it might not have purchased the Property, it might have decided to purchase the Property for a reduced price, or it may have planned differently and avoided other surprise costs. *See Iqbal*, 556 U.S. at 663–64 (noting whether a complaint states a plausible claim is "context specific" and requires "the reviewing court to draw on its experience and common sense").

ECS seeks to avoid this inference by casting DC Water's allegations as ones of "potential influence, not causation." ECF 39-1, at 18. This argument is unavailing because it is common sense that knowledge of a significant environmental liability will affect how a company proceeds in purchasing a property. *See Iqbal*, 556 U.S. at 663–64. While it is unclear precisely how this knowledge would have affected DC Water's decision, it is reasonable to infer that it *would* have

16

affected its decision in some way that would have saved it from paying the extra costs incurred due to the late discovery of environmental conditions on the property. Those extra costs are damages DC Water alleges ECS caused and therefore, taking the above well-pled facts as true, this suffices to plausibly allege proximate causation.

As ECS's arguments in both incorporated pleadings focused solely on proximate causation, ECS's motion to dismiss Count II is **DENIED** without prejudice.

## IV. CONCLUSION

For the foregoing reasons, ECS's motion to dismiss Crossclaim II, ECF 50, is **DENIED** without prejudice. A separate implementing Order will issue.

Dated: April 9, 2024

/s/
Brendan A. Hurson
United States District Judge